1  JAN STIGLITZ
2  State Bar No. 103815
   **LAW OFFICE OF JAN STIGLITZ**
3  225 Cedar St.
4  San Diego, CA 92101
   Tel.: (619) 525-1697
5  Fax: (619) 615-1497
6

7  Attorney for Plaintiff
   **MICHAEL RAY HANLINE**
8

9              UNITED STATES DISTRICT COURT
10             CENTRAL DISTRICT OF CALIFORNIA
11                  WESTERN DIVISION

12  MICHAEL RAY HANLINE,          )   Case No.
13                                )
    Plaintiff,                    )   **COMPLAINT FOR DAMAGES**
14                                )
15  v.                            )   **(1) DEPRIVATION OF CIVIL**
16                                )   **RIGHTS, 42 U.S.C. § 1983, *BRADY***
    COUNTY OF VENTURA;            )   **VIOLATIONS;**
17  OFFICE OF THE VENTURA         )
18  COUNTY DISTRICT               )   **(2) JOINT ACTION/CONSPIRACY**
19  ATTORNEY;                     )   **TO INTERFERE WITH CIVIL**
    VENTURA COUNTY                )   **RIGHTS, 42 U.S.C. § 1985, *BRADY***
20  SHERIFF'S DEPARTMENT;         )   **VIOLATIONS;**
21  LOUIS SAMONSKY;               )
22  MARTIN McCOY;                 )   **(3) DEPRIVATION OF CIVIL**
23  and DOES 1-10 INCLUSIVE,      )   **RIGHTS, 42 U.S.C § 1983, FALSE**
                                  )   **EVIDENCE VIOLATIONS;**
24  Defendants.                   )
25                                )   **(4) JOINT ACTION/CONSPIRACY**
                                  )   **TO INTERFERE WITH CIVIL**
26                                )   **RIGHTS, 42 U.S.C. § 1985, FALSE**
27                                )   **EVIDENCE VIOLATIONS;**
28                                )
                                  )   **(5) VIOLATION OF CIVIL RIGHTS,**

)    42 U.S.C § 1983, SUPERVISORIAL
)    LIABILITY; and
)
)    (6) DEPRIVATION OF CIVIL
)    RIGHTS, 42 U.S.C. § 1983, *MONELL*
)    VIOLATIONS
)
)    DEMAND FOR JURY TRIAL

# I.

## JURISDICTION AND VENUE

1.  This action is brought by Plaintiff MICHAEL RAY HANLINE ("Mr. Hanline" or "Plaintiff") pursuant to 42 U.S.C. §§ 1983 and 1985.

2.  This Court has jurisdiction under 28 U.S.C. § 1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §§ 1983 and 1985, and under 28 U.S.C. § 1331.

3.  The acts and omissions complained of herein commenced on November 10, 1978, and continued until April 22, 2015, within the Central District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. § 1391.

# II.

## SUMMARY OF CLAIMS

4.  On December 14, 1978, Ventura County Sheriff's Department employees arrested Michael Hanline for the murder of J.T. McGarry[1] and related charges occurring on November 10, 1978. Mr. Hanline was not involved in the murder and was innocent of all charges arising from the murder. Even so, he was convicted at trial in 1980 for the murder and sentenced to a term of life in prison without the possibility of parole.

---

[1] McGarry's true name was Michael Mathers. Although this was an alias, court documents relating to this case refer to him as McGarry, and for clarity he will be referred to as McGarry throughout this Complaint.

5. On April 1, 1999, Mr. Hanline filed a Petition for Writ of Habeas Corpus in this Court, claiming his rights under the Constitution had been violated, and asking for his conviction to be reversed. On August 24, 2011, this Court denied the Petition.

6. On January 24, 2014, Mr. Hanline filed a Petition for Writ of Habeas Corpus in the Ventura County Superior Court, claiming his rights under the Constitution had been violated, and asking for his conviction to be reversed.

7. On November 13, 2014, the Office of the Ventura County District Attorney conceded the merits of the petition. That same day, Judge Donald D. Coleman of the Ventura County Superior Court reversed Hanline's conviction and set the case for retrial. On April 22, 2015, the Office of the Ventura County District Attorney moved to dismiss all charges.

8. In conceding Mr. Hanline's petition to reverse his conviction, the Office of the Ventura County District Attorney pointed to numerous exculpatory documents which had been suppressed by both the Ventura County Sheriff's Department and its own office. These documents—primarily investigation reports prepared by Ventura County Sheriff's Department employee Martin McCoy, the lead investigator in the case—showed that others had taken responsibility for the murder before Mr. Hanline's conviction, that witnesses knew key facts of the crime which were not known to the general public, and that these facts could not have been known by those individuals without their direct involvement in the crime.

9. In conceding the merits of Mr. Hanline's petition, the Office of the Ventura County District Attorney agreed with the findings of Magistrate Judge Andrew Wistrich of this Court, "who ultimately determined that there had been serious discovery-related Constitutional violations" in the case. Response to Petition for Writ of Habeas Corpus in *In re Michael Hanline*, Ventura County Superior Court Case No. CR14566 ("Response"), p. 4. As Judge Wistrich noted, "[t]he

case against [Hanline] was far from overwhelming. It was entirely circumstantial." Response, p. 4, citing Report and Recommendation of Magistrate Judge in *Michael Hanline v. George Galaza*, United States District Court (Central District) Case No. EDCV 00-530-VAP (AJW) ("R&R"), p. 47.

10. The Office of the Ventura County District Attorney concluded that, after reviewing the case and the claims Mr. Hanline made in his petition, the circumstantial evidence in the case no longer supported Mr. Hanline's conviction.

11. Specifically, the Office of the Ventura County District Attorney determined that had the suppressed documents—documents prepared by employees of the Ventura County Sheriff's Department, and suppressed by both the Ventura County Sheriff's Department and the Office of the Ventura County District Attorney—been turned over to Mr. Hanline, he would have been able to establish credible evidence that "other individuals had actually committed the murder and were attempting to 'frame' [Hanline]." Response, p. 8. These documents were never turned over to the defense, despite a court's order to Ventura County Sheriff's Department Officer Martin McCoy to do so. The District Attorney has admitted the court order "directed the prosecutor" to "turn that information over to the defense. That never occurred." Response, p. 8.

12. The failure to turn over these reports formed the basis for the magistrate judge's findings that *Brady* errors had been committed. In recommending Mr. Hanline's conviction should be reversed, the magistrate judge noted: "Despite recognizing the importance of the evidence to the defense, and in spite of the trial court's order requiring the prosecutor to turn the evidence over to the defense, both the prosecutor and McCoy failed to disclose the [suppressed documents] to [Hanline]." R&R, p. 36. Indeed, the Office of the Ventura County District Attorney has "concede[d] that failure to disclose [this evidence] violated *Brady v. Maryland*." Response, p. 4.

COMPLAINT 4

13. In addition, the Office of the Ventura County District Attorney admitted that "[a]dditional evidence obtained after trial is contrary to the prosecution's theory upon which the guilty verdict was based." Response, p. 2. This included the exculpatory results of DNA testing, performed at the initiative of the District Attorney in 2014 on a number of items of evidence. Response, pp. 2-3. The results of this testing—on the tape used to bind the victim's hands, and on other items found at the scene—definitively "contradict[ed] the prosecution's theory at trial that [Hanline] and Messer committed the murder." Response, p. 3.

14. Finally, in conceding to the petition, the Office of the Ventura County District Attorney acknowledged it had

> interviewed several individuals who were involved in the events surrounding the murder of the victim. These interviews suggest that persons other than [Hanline] also had motives and means to kill the victim. These interviews, together with evidence from the in camera hearings discussed above and the federal habeas evidentiary hearing, also suggest that witnesses were manipulated and threatened and discouraged from cooperating with the prosecution or with the Innocence Project.

Response, p. 8.

15. Mr. Hanline spent more than thirty-six years in custody as a result of the wrongful actions of the Office of the Ventura County District Attorney, the Ventura County Sheriff's Department, and named Defendants, Ventura County Deputy District Attorney Louis Samonsky and Ventura County Sheriff's Department Officer Martin McCoy.

16. Under color of law, the Defendants subjected Mr. Hanline, or caused Mr. Hanline to be subjected, to the deprivation of his Constitutional rights by framing Mr. Hanline for the murder, withholding exculpatory evidence, disregarding or suppressing evidence of third-party culpability, and concealing the true reason McGarry was killed and the true perpetrators of the crime. This evidence, had it been disclosed before trial, would have raised reasonable doubt as to his guilt.

17. Furthermore, and in the alternative, the wrongful actions of the Defendants stem

1   from a conspiracy between the Defendants—together with a private defense
2   attorney, Bruce Robertson—to frame Mr. Hanline for the murder, withhold
3   exculpatory evidence, disregard or suppress evidence of third-party culpability,
4   and conceal the true reason McGarry was killed and the true perpetrators of the
5   crime. This conspiracy arose out of the Defendants' desperation to convict Mr.
6   Hanline at any cost, and motivated Defendants to make a concerted effort to
7   steer the investigation toward one, false, conclusion: that Hanline had killed
8   McGarry.

9   18.   In addition, the policies and customs of the Ventura County Sheriff's
10        Department ignored, circumvented, and/or rejected those office's obligations
11        under *Napue v. Illinois*, 360 U.S. 264 (1959); *Brady v. Maryland*, 373 U.S. 83
12        (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), and thus directly
13        contributed to the violations of the rights of Mr. Hanline.

14  19.   Further, the Ventura County Sheriff's Department failed to institute
15        administrative policies and practices necessary for ensuring that the office
16        complied with its obligations under *Napue v. Illinois, supra*, 360 U.S. 264; *Brady
17        v. Maryland, supra*, 373 U.S. 83; and *Giglio v. United States, supra*, 405 U.S.
18        150.

19  20.   In addition, the policies and customs of the Office of the District Attorney for
20        the County of Ventura directly contributed to the violations of Mr. Hanline's
21        rights under *Napue v. Illinois, supra*, 360 U.S. 264; *Brady v. Maryland, supra*,
22        373 U.S. 83; and *Giglio v. United States, supra*, 405 U.S. 150.

23  21.   Further, the Office of the District Attorney for the County of Ventura failed to
24        institute administrative policies and practices necessary for ensuring that the
25        office complied with its obligations under *Napue v. Illinois, supra*, 360 U.S. 264;
26        *Brady v. Maryland, supra*, 373 U.S. 83; and *Giglio v. United States, supra*, 405
27        U.S. 150.

28  22.   As a result of these actions, inactions, policies, and failures, Mr. Hanline became,

1    through no fault of his own, the longest-serving wrongfully incarcerated individual

2    in California's history.

### III.

### PARTIES

23.   Plaintiff Michael Hanline is a citizen of the State of California and the United States, and resided within the State of California at all times herein alleged.

24.   At all times relevant to this lawsuit, Defendant Martin McCoy was employed by and working on behalf of the Ventura County Sheriff's Department, and resided within the jurisdiction of the State of California. In his capacity as an employee of the Ventura County Sheriff's Department, he was the lead investigator on the investigation of the case against and in the prosecution of Mr. Hanline. Defendant McCoy is also sued in his individual capacity.

25.   At all times relevant to this lawsuit, Defendant Louis Samonsky was employed by and working on behalf of the Office of the Ventura County District Attorney, and resided within the jurisdiction of the State of California. In his capacity as an employee of the Office of the Ventura County District Attorney, he was the lead prosecutor in the prosecution of Mr. Hanline. Defendant Samonsky is also sued in his individual capacity.

26.   At all times herein, Defendant County of Ventura was a public entity, organized and existing under the laws of the State of California. The Ventura County Sheriff's Department was and is, at all times herein, an agency of the County of Ventura.

27.   At all times herein, Defendant Office of the District Attorney for the County of Ventura was a public entity, organized and existing under the laws of the State of California. The Office of the District Attorney for the County of Ventura was and is, at all times herein, an agency of the County of Ventura.

28.   Plaintiff Michael Hanline is informed, believes, and thereon alleges that Defendants sued herein as Does 1 through 10, inclusive, were employees of the

Ventura County Sheriff's Department, and were at all relevant times acting in the course of their employment and agency. Each Defendant is the agent of the other. Mr. Hanline alleges that each of the Defendants named as a "Doe" was in some manner responsible for the acts and omissions alleged herein, and Plaintiff will seek leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained.

## IV.

## GENERAL ALLEGATIONS

29. Plaintiff is informed, believes, and thereon alleges, that, at all times herein mentioned, each of the Defendants was acting under color of law to deprive Mr. Hanline of his Constitutional rights.

30. In addition, and in the alternative, Plaintiff is informed, believes, and thereon alleges, that, at all times herein mentioned, each of the Defendants was the agent and/or employee and/or co-conspirator of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting under color of law, within the scope of such agency, employment and/or conspiracy, and with the permission and consent of other co-defendants.

31. Each paragraph of this Complaint is expressly incorporated into each cause of action which is a part of this Complaint.

32. The acts and omissions of all Defendants were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Plaintiff Michael Hanline.

## V.

## FACTUAL ALLEGATIONS

A. **Background**

33. This claim arises from the investigation, prosecution, conviction, and incarceration of Michael Ray Hanline for the murder of J.T. McGarry, who disappeared on November 10, 1978, and whose body was found on November

1    12, 1978. Although Mr. Hanline was convicted and incarcerated for the murder,

2    he is innocent of the crime, and his conviction has been reversed.

3    34.    Mr. Hanline spent the better part of his life wrongfully incarcerated for this

4    crime. He was in custody for over thirty-six years, from his arrest on December

5    14, 1978, to the dismissal of all charges against him on April 22, 2015.

6    35.    Mr. Hanline served all of these years in custody in maximum security prisons

7    and was therefore subject to the severe limitations and indignities inherent in

8    such settings. Further, because of his sentence of life without the possibility of

9    parole, Mr. Hanline was subject to even more restrictions and fewer

10    opportunities while in prison. Mr. Hanline experienced the fear and anxiety of

11    being imprisoned with the State's most serious and violent offenders. More

12    fundamentally, Mr. Hanline lost his youth and the years during which he would

13    have worked and spent time with his family.

14    36.    From his arrest and throughout his thirty-six years in custody, Mr. Hanline

15    proclaimed his innocence and relentlessly worked to procure his release by

16    showing that a miscarriage of justice occurred. In pursuit of relief, he filed

17    multiple pro se petitions for writs of habeas corpus at all levels of the California

18    state courts, and a petition for writ of habeas corpus in this Court, before

19    obtaining pro bono counsel to conduct further investigation and file the

20    successful petition which demonstrated his innocence.

21    37.    Mr. Hanline's resilience and knowledge of his innocence allowed him to survive

22    and even be productive while in prison, but tragically, some of the best years of

23    his life were taken from him based on the unconstitutional acts of employees and

24    agents of the Ventura County Sheriff's Department and the Office of the

25    Ventura County District Attorney. He was deprived of the rights and privileges

26    our society holds most dear: freedom, justice, the ability to raise a family, pursue

27    a career, and pursue all of his other dreams.

28

**B.    Bruce Robertson, the Prosecution's Witnesses, and Ventura County Law
Enforcement**

38.    Bruce Robertson was a criminal defense attorney in the County of Ventura,
admitted to the State Bar in 1974. While a defense attorney, he represented a
number of individuals from the motorcycle community in and around Ventura,
including members of the Hells Angels motorcycle club and the Diablos
motorcycle club.

39.    Many of the individuals Robertson represented were persons of interest or
witnesses in the McGarry murder case. Indeed, Robertson initially represented
Mary Bischoff, the prosecution's "star witness," in connection with McGarry's
murder. He also represented five other prosecution witnesses in connection
with the case: Sterling Holt, witness "D,"[2] Dave Olson, Mike Gross, and Bonnie
Mellinger. In addition, Robertson represented McGarry's estate and members
of McGarry's family. He was also a witness for the prosecution in the case.

40.    Mari Morsell was an employee of the Ventura County Public Defender's Office
from 1975 to 1979. While employed there, Morsell attended a Christmas party
at the home of Robertson. There, Morsell saw numerous police officers and
sheriff's deputies using cocaine.

**C.    The Murder of J.T. McGarry**

41.    Before his death, J.T. McGarry was employed by Paisano Publications. His job
was to attend motorcycle-oriented "swap meets" and promote one of Paisano's
magazines, Easy Rider. McGarry eventually began to organize these swap meets
all over the nation. McGarry received a percentage of the profits from such
ventures. McGarry had an on again/off again relationship with Mary Bischoff,
who would travel with him and keep the books for McGarry.

42.    In January of 1977, Bischoff met Michael Hanline while he was working at a

[2]Certain names have been ordered redacted by this Court. See *Hanline v. Galaza*, Case
No. EDCV 00-530-VAP(AJW).

1    booth at one such swap meet. Over the next few months, Hanline began to work
2    security at the gate for some of the larger swap meets. For about a year, Hanline,
3    Bischoff, and McGarry would travel around the country together to set up and
4    work these swap meets.

5    43.    At some point before McGarry's death, both McGarry and Hanline became
6    romantically involved with Bischoff. In fact, although Bischoff kept a number
7    of her belongings at McGarry's house, she was staying with Hanline on
8    November 10, 1978, the night of McGarry's disappearance.

9    44.    Bruce Robertson later claimed that, on November 10, 1978, he called
10    McGarry—whom he described as both his client and a personal friend—to discuss
11    the upcoming weekend. The line was busy, and eventually, Robertson learned
12    from an operator the phone was off the hook. Others who went to McGarry's
13    house that evening found it empty. McGarry did not return that evening.
14    Robertson later stated that based on this—and on no other—information, he
15    suspected McGarry had been murdered.

16    45.    On November 12, 1978, law enforcement found McGarry's body with multiple
17    gunshot wounds to the chest and head near California Route 33, off of Matilija
18    Canyon and Wheeler Gorge. Ventura County Sheriff's Department Lieutenant
19    Harrison dispatched Officer Martin McCoy to Wheeler Gorge to investigate a
20    dead body, later identified as McGarry. McCoy arrived to find Ventura County
21    Sheriff's Department Officers Bryant, Harrison, Rogers, Rudd, and Smith, as
22    well as Ventura County Crime Laboratory employee Richard Fox, at the
23    location.    Sheriff's investigators and Ventura County Medical Examiner
24    investigator Margot Martin took the body to the county morgue.

25    46.    Investigators discovered duct tape around McGarry's right wrist. It appeared to
26    investigators that McGarry's hands had been bound earlier, indicating he may
27    have been shot first and later transported to where his body was found.

28    47.    Investigators later learned that Bischoff and Hanline (with Hanline's later co-

1    defendant, Bo Messer) had driven over to McGarry's house in the early morning

2    hours of November 12, 1978, before McGarry's body was discovered, and

3    before anyone—with the exception of Bruce Robertson—suspected he had been

4    murdered.  Bischoff, Messer, and Hanline took a number of items from the

5    house that Bischoff said belonged to her.

6  **D.**  **Robertson's Involvement in the Investigation and McCoy's Complicity**

7  48.  Robertson's office became a "base of operations" and "home away from home"

8    for the law enforcement investigators tasked with investigating the McGarry

9    murder.  Ventura County Sheriff's Department Officers Martin McCoy and

10  Richard Rodriguez were seen on a constant basis at Robertson's law office, and

11  they frequently asked him to set up meetings and interview witnesses to further

12  the investigation.  They also showed Robertson confidential *Brady* material

13  (discussed in section (F), post)—and gave him copies of the same—to get

14  Robertson's assessment on the case.

15  49.  Despite this constant presence at Robertson's office, investigators did not

16  discover—or did not care—that Robertson was dealing drugs out of his office, and

17  using drugs, specifically cocaine, at the time of the investigation.

18  50.  Investigators also did not discover Robertson had a number of false-bottomed

19  Pennzoil cans in his office containing cocaine.  The same type of false-bottomed

20  Pennzoil can was discovered at McGarry's house after the murder, further

21  implicating Robertson in the crime.

22  51.  According to Bruce Robertson's later interviews with police, and according to

23  multiple witnesses, Robertson suspected McGarry was dead before the body had

24  even been discovered.  Within a few days of the murder, and at the behest of

25  Robertson, Ventura County Sheriff's Department investigators, including Martin

26  McCoy and Richard Rodriguez, focused their attention on Hanline.

27  52.  McGarry had motorcycle boots on when his body was found, causing

28  investigators to conclude he was a local biker.  Because of this, on November 13,

1978, Ventura County Sheriff's Department Officers McCoy and Richard Rodriguez took Polaroid photographs of the body and showed the Polaroids to two witnesses at a Ventura County motorcycle shop. The witnesses identified the person in the photographs as McGarry.

53.  Thereafter, the officers returned to the morgue, and were told by unnamed medical examiners that the cause of death was multiple gunshot wounds.

54.  Upon leaving the morgue, Officers McCoy and Rodriguez learned Bruce Robertson and McGarry's roommate, Sterling Holt (who was also a client of Robertson), wished to discuss the murder with the investigators. Robertson told the officers he was McGarry's attorney and that he had already gone to the morgue to identify McGarry's body. Robertson also disclosed he had told Sterling Holt that McGarry was missing "under unusual circumstances" a few days before. Holt was apparently concerned enough by what Robertson had said that he had flown down from Oregon, even before anyone (other than Robertson) suspected McGarry was dead.[3]

55.  On or about November 13, 1978, Ventura Police Department Officer S. Rathburn received an anonymous call from an unidentified male; the caller referenced the McGarry murder and told Rathburn to look into Bischoff if they wanted to "know the truth about" the murder. Unnamed Ventura County Sheriff's Department Officers received a similar call that week; this information was passed on to Officers McCoy and Rodriguez.

56.  In an undated report, but written close in time to the murder, Ventura County Sheriff's Department Officer Martin McCoy documented how completely investigators had turned over the investigation to Bruce Robertson, who should have been one of their prime suspects:

---

[3]Bruce Robertson later testified Holt had told him McGarry was dead. See paragraph 91, post.

1

2          Monday, November 13, I spoke with Attorney Robertson
   who furnished the following information:
3          He says that he represents many dope and biker-type people
   and that bikers, as a matter of ethics, would not talk to the police.
4  He said that [Bischoff] had split up with [McGarry] and had taken
   up with another person (we believe "[Hanline]"), but that
5  [McGarry] had recently gotten back with [Bischoff].   Robertson
   also said that his independent checks with various people had
6  convinced him that the murder was not dope related, even though
   [McGarry] was an occasional user of cocaine.   He said that he
7  heard "[Hanline]" and [Bischoff] were on the run and that persons
   friendly to [McGarry] were looking for them. Robertson also said
8  that a friend of Hot Rod [aka "D"], named Chuck [Blaylock], had
   received a call from [Bischoff] saying that she was not responsible
9  for what had happened to [McGarry]—this call supposedly was
   received Sunday night.
       . . .
10         Attorney Robertson, throughout this investigation has acted
   as an intermediary between the biker type street people and
11  ourselves. He feels his position is tenuous. These people do not
   want to talk to the police and would be upset if they knew that he
12  was.    Robertson, however, wants us to find [Bischoff] and
   "[Hanline]" before the motorcycle people do. The most significant
13  information that he has furnished is that he was told by Hot Rod
   that on Sunday evening, before the body was discovered, Chuck
14  Blaylock received a telephone call from [Bischoff]. [Bischoff] was
   crying and said that she was not responsible for what happened.
15     . . .
16         Attorney Robertson told me that he did not know if Chuck
   was being honest with me, and that one of the reasons that he had
17  contacted [McGarry's] roommate was the information from Chuck
   as related by Hot-Rod, that [McGarry] was already dead.

18  Ventura County Sheriff's Department Follow-up and Continuation Report

19  (Undated) by Ventura County Sheriff's Department Officer Martin McCoy, pp.

20  4-7.

21  57.   On December 9, 1978, Robertson arranged for Bischoff to return to California

22       to talk to investigators. Robertson had a first class ticket waiting for Bischoff at

23       the airport.  During the flight, Bischoff drank champagne, wine, whisky, beer,

24       and a couple of Bloody Marys.

25  58.   When Bischoff arrived at LAX, she was met by Robertson, Ventura County

26       Sheriff's Department Officer Martin McCoy, and another Sheriff's Department

27       employee.    Robertson took Bischoff to a bar in the airport where she,

28       Robertson, and the Ventura County Sheriff's Department officers drank beer.

COMPLAINT 14

59. Robertson then drove Bischoff to the Sheriff's station. On the way, they stopped again and Bischoff had another beer. During the drive, Robertson reiterated to Bischoff that Hanline was responsible for MacGarry's death.

60. Thereafter, Bischoff sat down with Ventura County Sheriff's Department Officers Martin McCoy and Richard Rodriguez and Ventura County Deputy District Attorney Jay Johnson for a witness interview. Bruce Robertson was present for the interview.

61. During that interview, Robertson stated repeatedly, and on the record, that he was not acting as Bischoff's attorney. In spite of this, Robertson repeatedly stopped the questioning of Bischoff and pulled her out of the room to confer with her. At one point, Robertson told the officers, "Don't get into that area."

62. Investigators capitulated to Robertson's requests, stating on the record that "apparently Bruce doesn't want me to get into that aspect, so we'll skip over that." At Robertson's repeated prompting, Bischoff ultimately implicated Hanline in the murder.

## E. The Prosecution of Michael Hanline

63. Before arraignment, Hanline's original trial attorney, Jack Janis, told Deputy District Attorney Michael Schwartz that Robertson had threatened Janis in a successful effort to get him to drop Hanline as a client. Robertson told Janis that the Hell's Angels "didn't want no shit" on the murder, and that the Angels wanted Hanline to "sit in his own mud" for the case. Janis related this threat to Ventura County Deputy District Attorney Michael Schwartz, who did not confront Robertson or follow up in any way.

### 1. Gail Stanley

64. Gail Stanley was J.T. McGarry's wife. They were married in 1961. Stanley and McGarry had three children together, and moved to Ventura around 1973.

65. Shortly after the two moved to Ventura, Stanley and McGarry separated; they grew apart after McGarry began hanging out and associating with motorcycle

gangs like the Hells Angels. Stanley was also scared of the people involved with McGarry's work for Easy Rider Magazine and Paisano Publications—specifically Joe Teresi and an individual identified as witness "A"—because the magazine and its employees were involved in the drug trade and the mafia.

66. Although the two were separated, Stanley and McGarry still saw and spoke to each other regularly up until the time of his disappearance and death.

67. Two weeks before his death, McGarry came by Stanley's house to speak with her. McGarry was scared, worried, and agitated; it was obvious to Stanley that he was afraid of what would happen to him if he stayed in town. McGarry told Stanley that he had saved up some money, and that the two of them, and their children, could leave and start a new life somewhere else.

68. McGarry specifically told Stanley that he had to escape from Easy Rider, and had to get away from the people he worked with at the magazine.

69. After McGarry's death, Paisano Publications—Joe Teresi and witness "A"—paid for all of the expenses associated with McGarry's funeral and burial, and arranged a wake for McGarry attended by hundreds of bikers and Hells Angels.

70. Around the same time funeral arrangements were being made by Paisano, and less than a week after McGarry's death, Stanley received a visit from Sterling Holt, McGarry's roommate, and "Hot Rod," a local biker.[1] Holt and witness "D" took Stanley to meet Bruce Robertson, who they said was taking care of the legal issues surrounding McGarry's alias and his Social Security benefits. As noted in note 1, McGarry was an alias; his real name was Michael Mathers. McGarry created the alias, got a social security card, and began holding himself out as McGarry shortly after he moved to Ventura.

71. Robertson took care of all the legal issues surrounding McGarry's funeral

[1] "Hot Rod" was also a client of Robertson's, and was named in the undated report (later consolidated with other reports to comprise the eight-page report) written by Ventura County Sheriff's Department Officer Martin McCoy.

1  arrangements, including Stanley's Social Security issues, the burial plot, and the
2  burial. He did not charge Stanley for his legal services.

3  72.  Stanley remembered that Robertson was dependent on cocaine and was very
4  scared around this time. Holt and Hot Rod told Stanley that Robertson owed
5  a lot of money to someone, and Stanley understood it to mean that Robertson
6  owed money to people in the cocaine trade.

7  73.  Despite the fact Stanley was known as a potential witness due to her marriage,
8  knowledge, and close relationship with McGarry, the Ventura County Sheriff's
9  Department—and specifically, Ventura County Sheriff's Department Officer
10  Martin McCoy—never interviewed Stanley during the investigation into the
11  McGarry murder.

12  74.  In fact, no authorities contacted Stanley at all at any point in the investigation of
13  the case. It was not until Stanley called Ventura County Deputy District Attorney
14  Louis Samonsky during trial to volunteer her testimony that she ever spoke to
15  any authorities about the case.

16  75.  During the trial, Samonsky and Ventura County Sheriff's Department Officer
17  Martin McCoy met with Stanley to discuss what she knew regarding the case.

18  76.  McCoy and Samonsky told Stanley that they were desperate to get Hanline, and
19  that they were frustrated because they believed Hanline had gotten away with
20  other murders in the past on technicalities, and that "they had to get him this
21  time. He'd walked too many times." Indeed, McCoy and Samonsky admitted
22  to Stanley they were "desperate" to convict Hanline, and indeed so desperate
23  that they were using a different version of what they believed had actually
24  happened.

25  77.  During this conversation, McCoy and Samonsky told Stanley they knew
26  McGarry had been embezzling money from Paisano Publications in the months
27  shortly before his death, and that Paisano—witness "A" and Joe Teresi—knew
28  about the embezzlement. They told Stanley that Paisano had killed McGarry to

1    make an example of him and to stop the embezzlement.

2    78.   Stanley remembered that McCoy and Samonsky believed the embezzlement
3          scheme was the real reason McGarry was killed. They told Stanley they were
4          proceeding with a "love triangle" theory involving Mary Bischoff because of their
5          desperation to convict Hanline.

6    79.   When Stanley heard this information about McGarry's embezzlement, she
7          remembered the conversation she had had with McGarry two weeks before his
8          death. She told McCoy and Samonsky about that conversation because she
9          thought it would be relevant to their case. Nevertheless, Samonsky and McCoy
10         explained to her they were going with the theory that Hanline killed McGarry
11         because the two were in a love triangle with Mary Bischoff.

12         2.    Mary Bischoff

13   80.   The prosecution's case hinged almost entirely on Mary Bischoff. Indeed,
14         Ventura County Deputy District Attorney Louis Samonsky admitted Bischoff
15         was the "star witness" in the case.

16   81.   Bischoff's testimony was incredibly suspect. She was under the influence of
17         drugs during the trial, and the judge had to adjourn the proceedings for that
18         reason.

19   82.   Bischoff's testimony was also entirely directed by Robertson, despite the fact he
20         repeatedly stated he was not acting as Bischoff's attorney, and these facts were
21         known by Ventura County Sheriff's Department Officer Martin McCoy. When
22         Bischoff was in jail before Mr. Hanline's trial, she told McCoy that if he did not
23         get her out of jail, she would take the witness stand and testify that Robertson had
24         told her what to say. In addition, Cain DeWitt, a prosecution witness and one
25         of Robertson's numerous clients, testified that Bischoff told him that Robertson
26         was telling her what to say.

27   F.    **Suppressed _Brady_ Material**

28         1.    The Fourteen-Page Report

COMPLAINT 18

83. Over the course of six months—beginning October 23, 1978, shortly before the murder, and concluding May 9, 1979, well after charges were filed against Mr. Hanline—a series of reports were written by various law enforcement investigators, namely Los Angeles Narcotics Investigators William Marsden and Danny Lott, Richard McKenna, and Ventura County Sheriff's Department Officer Martin McCoy. Together they compose a report later referred to as "the fourteen-page report."

84. The Office of the Ventura County District Attorney has conceded that the fourteen-page report constituted *Brady* material, and that the failure to turn the report over to Mr. Hanline violated his Constitutional rights to Due Process.

85. The fourteen-page report documents the investigation by Ventura County Sheriff's Department Officer Martin McCoy into a series of phone calls relating to a group of cocaine dealers in the area. These individuals—Larry New, Chris Kuen, and Jim Foster (also known as William Stymus)—were clients of Bruce Robertson, and Robertson is also named in the fourteen-page report as a potential suspect.

86. The fourteen-page report describes how a witness overheard these individuals talking about McGarry's murder and implicating themselves, not Mr. Hanline, in the murder.

87. The report also documents how Ventura County Sheriff's Department Officer Martin McCoy took this information directly to Bruce Robertson, despite the fact Robertson was named by the witness in the report, making him a potential suspect, and despite the fact the individuals were Robertson's clients.

88. After a series of conversations and phone calls, which the report documents, Robertson informed McCoy that—based on Robertson's own, independent investigation—McGarry's murder was not related to drugs, and Robertson's clients did not commit the murder.

89. The report also contains the following statement from Ventura County Sheriff's

Department Officer Martin McCoy, plainly noting how completely McCoy had turned over the investigation and decision-making to Robertson and his confederates:

> [i]f . . . this furnished information fits any defense theory, I feel an obligation to report that I have been advised, specifically by Robertson and vaguely by Stymus, that contact and subpoenas by the defense or myself with Larry New and Chris Kuen will create a "blood bath" and result in death to any suspected informants.

90. On June 28 and 29, 1979, Ventura County Superior Court Judge Ben Ruffner held in camera, ex parte hearings regarding the discovery of the fourteen-page report. In these hearings, Ventura County Deputy District Attorney Louis Samonsky requested that the fourteen page report not be disclosed to the defense.

91. In support of this claim, the District Attorney presented attorney Bruce Robertson to make an oral proffer to Judge Ruffner concerning the report and what he knew about the murder.

92. Robertson explained to Judge Ruffner how he found out about McGarry's murder; he had previously given a version of this story to Ventura County Sheriff's Department Officers Martin McCoy and Richard Rodriguez. However, Robertson's story in front of Judge Ruffner differed significantly on certain key points. For example, Robertson had previously told McCoy *he (Robertson) contacted Holt* shortly after McGarry disappeared, and convinced Holt to fly down from Oregon to investigate. In the in camera hearing, Robertson testified Holt *told him* McGarry was dead.

93. Importantly, the report—and the in camera testimony before Judge Ruffner relating to it—details how Bruce Robertson knew about the murder before anyone else did, and tried to protect his friends and clients from becoming suspects in the investigation. The report implicated not only Robertson's clients in the murder, but Robertson himself. Robertson made desperate pleas in front of Judge Ruffner to seal all of this material, even making the incredible claim that

1    Los Angeles Police officers had fabricated the information.

2    94.    Robertson's inconsistent and incriminating statements were known to Ventura
3           County authorities, including Ventura County Sheriff's Department Officer
4           Martin McCoy and Ventura County Deputy District Attorney Louis Samonsky.
5           Despite Judge Ruffner's order to turn over these statements, they refused.

6           2.    The Eight-Page Report

7    95.    Another report, later named "the eight-page report," documents the investigation
8           by Ventura County Sheriff's Department Officer Martin McCoy into a phone
9           call made by "A," who was a confidential informant, to the Los Angeles Sheriff's
10          Department.

11   96.    The Office of the Ventura County District Attorney has conceded that the eight-
12          page report constituted *Brady* material, and that the failure to turn the report
13          over to Mr. Hanline violated his Constitutional rights to Due Process.

14   97.    Witness "A" ran Paisano Publications, which produced a magazine called Easy
15          Rider in 1978. Bischoff and McGarry worked for "A" setting up and running
16          motorcycle swap meets in 1978. As noted ante, in addition to running the swap
17          meets, McGarry would skim some of the money earned from the swap meets for
18          himself. Bischoff was present when McGarry embezzled these funds and also
19          skimmed money from Paisano with McGarry.

20   98.    According to the eight-page report, on November 26, 1978 (approximately two
21          weeks after the murder), "A" called the Los Angeles Sheriff's Department and
22          left a message stating he had information regarding the murder of McGarry. "A"
23          stated that the prosecution witness, Mary Bischoff, had called "A" that day to give
24          him information about the murder.

25   99.    Many of the facts "A" stated he got from Bischoff were inconsistent with her
26          police interview and eventual trial testimony. These facts were not public
27          knowledge at the time of the phone call; the only way "A" could have gotten the
28          information was either through Bischoff or through his own involvement in the

1    crime.

2    100.    The report later became the subject of two ex parte, in camera hearings in front
3            of Judge Robert Soares during Mr. Hanline's trial. On January 19, 1979, and
4            January 22, 1979, Judge Soares heard argument from Ventura County Deputy
5            District Attorney Louis Samonsky as to why Samonsky believed the eight-page
6            report should not be turned over to the defense. Also present at these hearings
7            was Ventura County Sheriff's Department Officer Martin McCoy and Bruce
8            Robertson.

9    101.    Samonsky explained to the court that "A" and his family would be in jeopardy
10           if his identity as a confidential informant were revealed. He therefore proposed
11           that Ventura County Sheriff's Department Officer Martin McCoy "re-interview"
12           witness "A" and prepare another report. This new report would contain the
13           information from the eight-page report, but would be written in such a way that
14           it appeared McCoy was the one to initiate the contact. In this way, "A's" identity
15           as an informant would be kept confidential, because it would appear as though
16           McCoy had simply followed a lead and spoken to "A" as a result of McCoy's
17           independent investigation.

18   102.    In order to accomplish this, Samonsky proposed that McCoy simply ask
19           Bischoff to confirm she talked to "A," and that thereafter McCoy could interview
20           "A" to get the information from him without compromising his identity as an
21           informant. Judge Soares agreed that this was the first step in determining
22           whether the alternate report could be drafted:

23               It appears to me that there is absolutely nothing the court can do
                 until two important things have been done by you and your
24               investigating team, and that is whether or not Mary is going to say
                 who the person is she talked to.
25

26   103.    Samonsky repeatedly attempted to work around Judge Soares's order to turn
27           over the eight-page report or the information it contained. For example, at one
28           point Samonsky asked whether the Court was allowing him to refuse to turn over

COMPLAINT 22

the information if he did not re-interview Bischoff:

> MR. SAMONSKY: . . . Is the Court saying that in the alternative, the People must write a report – a report that reflects information "A" gave to you today, or that the report is simply not discoverable, if we don't write one, and the information is not discoverable?
> THE COURT: . . . I'm convinced that the law is not going to allow [that].

104. Despite Samonsky's reluctance, Judge Soares repeatedly ordered the information contained in the eight page report to be turned over. The court instructed Ventura County Sheriff's Department Officer McCoy that he was required to "get a good interview with ["A"]" and that "it be accurate," and further clarified that "I'm convinced that the law is not going to allow any longer the – a non-discovery which is otherwise discoverable by just holding it in the head of a police officer –."

105. Despite the court's order, Mary Bischoff later testified she had never been interviewed by McCoy or anyone in law enforcement about whether she had spoken to "A."

106. More importantly, Bischoff later testified she had never spoken to "A" at any time about the murder.

107. The inconsistencies between the statements made by "A" and Bischoff, as well as Bischoff's denial that she had spoken to "A," show that the conversation "A" related to police never occurred. "A" likely knew details of the murder because he himself was involved, and called the police in an attempt to shift the blame to Michael Hanline.

108. These discrepancies were known to Ventura County District Attorney Samonsky and Ventura County Sheriff's Department Officer Martin McCoy well before they requested the report sealed.

109. The prosecution fought valiantly—and successfully—to prevent this second report from coming to light because Samonsky knew Mary Bischoff never spoke to "A." Judge Soares specifically directed Samonsky and investigator McCoy to

1  create a second report, starting with asking Mary Bischoff to whom she had
2  spoken. Samonsky knew her answer would be that she had never spoken to "A,"
3  and Bischoff herself confirmed this in her evidentiary hearing testimony in 2008.
4  If Bischoff never spoke to "A," then the second report could not be created.
5  And indeed, no such report was ever given to the defense.

6  **G.    Other Wrongdoing By the Defendants Discovered After the Conviction**

7  110.  Koni Burgess was the last known person to see McGarry alive on November 10,
8  1978. In 1986, Burgess told investigators working for Plaintiff Michael Hanline
9  that she was at McGarry's house on the night he disappeared. An individual
10  whom Burgess knew as "Tree" and "Bruce" (later identified as Bruce Robertson)
11  came to McGarry's house; shortly thereafter, McGarry told Burgess he was
12  taking her to a bar near his house and leaving her there so that he and Robertson
13  could do some business. McGarry left her at the bar and went back to
14  Robertson.

15  111.  Because they were being directed by Robertson in their investigation, Ventura
16  County investigators never interviewed Burgess, and never discovered
17  information implicating Robertson, specifically that Robertson was with McGarry
18  the last time he was seen alive. In fact, Ventura County officials exacerbated the
19  problem. In 1986, after being presented with the above information concerning
20  Burgess, authorities sent District Attorney Investigator Richard Haas to interview
21  Burgess in St. Louis, Missouri. Haas was formerly a police officer for the City
22  of Ventura, and had previously arrested Burgess at least once before, when she
23  was 11 years old. Not wanting to speak to Haas, Burgess recanted her prior
24  statements regarding Robertson. Ventura County Deputy District Attorney
25  Michael Schwartz used her recantation to oppose Hanline's request for relief in
26  1986, never confronting Robertson about what Burgess had originally said.

27  112.  Because they never interviewed Burgess, investigators never uncovered evidence
28  that the prosecution had a flawed timeline. At trial, Deputy District Attorney

Louis Samonsky argued Hanline accomplished the murder between 7:00 p.m. – 7:30 p.m. and 11:00 p.m. – 11:30 p.m. Hanline was a little more than an hour from McGarry's house that evening and would have arrived at McGarry's house between 8:00 p.m. and 8:30 p.m. Because Burgess was at McGarry's house during this time, had Hanline been at McGarry's house, Burgess would have seen Hanline.

113. Additionally, Burgess could have corroborated Hanline's defense at trial that he could not have committed the murder because he had been injured shortly before the incident. The prosecution had alleged he and his codefendant, Bo Messer, had shot and killed McGarry, and thereafter moved the body to dispose of it in Wheeler Gorge. Hanline's medical condition—resulting from a motorcycle accident he suffered fewer than one month before the murder, and necessitating the removal of his spleen—would have made it impossible for him to have moved McGarry or even assisted Messer in doing so, contrary to the prosecution's theory.

114. Burgess knew Hanline and saw him before and after the incident, and saw that Hanline had been severely injured as a result of this motorcycle accident. Had she been discovered, she would have corroborated the available medical evidence with her own credible testimony.

115. Further, because they never interviewed Burgess, investigators never discovered Robertson threatened Burgess during the investigation and trial. After the murder, and before Hanline's trial, Burgess ran into Robertson at a bar. Burgess's house had burned down, and she had been injured in the fire. Robertson told Burgess that something worse would happen to her if she talked, and directly threatened Burgess, saying, "You just keep your mouth shut or you will end up like [McGarry]."

116. At some point after the trial, Ventura County Sheriff's Department Officer Martin McCoy retired from the office. He joined the offices of Bruce Robertson

1    as a private investigator.

2    **H.    Participation, State of Mind, and Damages**

3    117.    All Defendants acted without authorization of law.

4    118.    Each Defendant participated in the violations alleged herein, or directed the
5          violations alleged herein, or knew of the violations alleged herein and failed to
6          act to prevent them. Each defendant ratified, approved and acquiesced in the
7          violations alleged herein.

8    119.    As joint actors with joint obligations, each defendant was and is responsible for
9          the failures and omissions of the other.

10   120.    Each Defendant acted individually and in concert with the other Defendants and
11          others not named in violating Plaintiff's rights.

12   121.    Each Defendant acted with a deliberate indifference to or reckless disregard for
13          an accused's rights for the truth in withholding evidence from the defense, and/or
14          for the Plaintiff's right to a trial free from constitutional defect, and free of active
15          concealment of material facts, and/or for the Plaintiff's right to due process of
16          law.

17   122.    As a direct and proximate result of the aforesaid acts, omissions, customs,
18          practices, policies, and decisions of the Defendants, Plaintiff has suffered great
19          mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock,
20          humiliation, indignity, embarrassment, harm to reputation, and apprehension,
21          which have caused Plaintiff to sustain damages in a sum to be determined at trial.

22   123.    Due to the acts of the Defendants, Plaintiff has suffered, and continues to suffer,
23          and is likely to suffer in the future, extreme and severe mental anguish as well as
24          mental and physical pain and injury. For such injury, Plaintiff will incur
25          significant damages based on psychological and medical care.

26   124.    As a further result of the conduct of each of these Defendants, Plaintiff has lost
27          past and future earnings in an amount to be determined according to proof at
28          trial.

125. As a further result of the conduct of each of these Defendants, Plaintiff has been deprived of familial relationships, including not being able to maintain a healthy and intimate relationship with his wife, and to raise a family.

126. The aforementioned acts of the Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith and done with reckless disregard or with deliberate indifference to the constitutional rights of the Plaintiff) entitling Plaintiff to exemplary and punitive damages from each defendant other than Defendant County of Ventura in an amount to be proven at the trial of this matter.

127. By reason of the above described acts and omissions of Defendants, Plaintiff was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988.

//

//

# FIRST CLAIM FOR RELIEF

## DEPRIVATION OF CIVIL RIGHTS

### 42 U.S.C.§ 1983

### *BRADY* VIOLATIONS

**(Against Defendants Samonsky, McCoy, and Does 1 – 10)**

128. Plaintiff realleges paragraphs 1 – 127, as well as any subsequent paragraphs in the Complaint, as if fully set forth herein.

129. Defendants Samonsky and McCoy and Does 1 – 10, while acting under color of law, deprived Plaintiff of his civil rights by violating his right to have material exculpatory evidence and information as required by *Brady v. Maryland*, 373 U.S. 83 (1963) (hereinafter *Brady* information) turned over to the Hanline defense.

130. The actions of each defendant in withholding evidence from the defense were done with deliberate indifference to or reckless disregard for Plaintiff's rights or for the truth.

131. The *Brady* violations asserted herein encompass, but are not limited to:

    a.    Failing to turn over a fourteen-page report detailing how others were claiming responsibility for the murder, despite a specific court order directing the report to be disclosed;

    b.    Failing to turn over an eight-page report detailing how one witness with a motive to kill McGarry had given facts and information about the circumstances of the murder, and had falsely claimed he had gotten the information from Mary Bischoff; and

    c.    Failing to turn over the report described in subsection (b), above, despite a specific court order directing the report to be disclosed.

132. The constitutional source of the obligation to provide *Brady* information is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiffs due process rights were violated by the conduct alleged herein. Plaintiff

1    brings this claim as both a procedural and a substantive due process violation.

2    To the extent that any court were to conclude that the source of Plaintiff's right

3    to *Brady* information is a constitutional source other than due process (such as

4    the Fourth Amendment or Sixth Amendment right to a fair trial), this claim is

5    brought on those bases as well.

6    133.    Defendants Samonsky and McCoy and the other Doe defendants were each

7    jointly and severally responsible to provide *Brady* information to the defense.

8    Each engaged in, knew or should have known of the unconstitutional conduct

9    alleged herein and failed to prevent it, which each had a responsibility to do, and

10    each ratified, approved or acquiesced in it.

11    134.    As a result of the defendants' violations, and each of their violations of Mr.

12    Hanline's constitutional rights to have *Brady* information turned over to the

13    defense, Mr. Hanline was damaged as alleged above.

## SECOND CLAIM FOR RELIEF

## JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS

## 42 U.S.C. § 1985

## *BRADY* VIOLATIONS

### (Against Defendants Samonsky, McCoy, and Does 1 – 10)

19    135.    Plaintiff realleges paragraphs 1 – 134, as well as any subsequent paragraphs

20    contained in the Complaint, as if fully set forth herein.

21    136.    Defendants Samonsky, McCoy, and Does 1 – 10 were jointly and severally

22    responsible as investigators assigned to the Hanline case to share material

23    information with each other, and to ensure that *Brady* information was turned

24    over to the defense.

25    137.    Defendants Samonsky, McCoy, and Does 1 – 10, acting under color of state law,

26    acted in concert, conspired and agreed with each other and/or with Bruce

27    Robertson to deprive Plaintiff of rights, privileges, or immunities secured by the

28    Constitution and laws of the United States, in particular the right to have *Brady*

1    information of which they were aware provided to the defense, as elaborated

2    above.  Each failure to provide *Brady* information, as well as other actions

3    related to them, constitutes an overt act in furtherance of said conspiracy.

4    138.    Alternatively, as joint actors with joint obligations, each of them was and is

5    responsible for the failures and omissions of each other.

6    139.    As a result of the defendants' violations, and each of their violations of Mr.

7    Hanline's constitutional rights to have *Brady* information turned over to the

8    defense, Mr. Hanline was damaged as alleged above.

**THIRD CLAIM FOR RELIEF**

**DEPRIVATION OF CIVIL RIGHTS**

**42 U.S.C. § 1983**

**FALSE EVIDENCE VIOLATIONS**

**(Against Defendants Samonsky, McCoy, and Does 1 – 10)**

14    140.    Plaintiff realleges paragraphs 1 – 139, as well as any subsequent paragraphs

15    contained in the Complaint, as if fully set forth herein.

16    141.    Defendants McCoy and Does 1 – 10 were jointly and severally responsible as

17    investigators assigned to the Hanline case to share material information with each

18    other, and to ensure that any witness information was true, accurate, credible,

19    and reliable.

20    142.    Defendants Samonsky, McCoy, and Does 1 – 10, while acting under color of

21    law, deprived Plaintiff of his civil rights, more particularly, his right to due

22    process of law, by providing false evidence in reports and statements, refusing to

23    turn over reports, improperly withholding the names of witnesses and the

24    information they provided, improperly influencing live testimony, improperly

25    influencing witnesses and fabricating and concealing evidence, and deprived Mr.

26    Hanline of liberty because they set in motion a reasonably foreseeable chain of

27    events that led to the presentation of false evidence at Plaintiff's criminal trial, his

28    conviction and incarceration.

143.  Each Defendant knew or should have known the evidence was false, and the defendant's conduct was done with deliberate indifference to and/or reckless disregard of Plaintiff's rights or for the truth.

144.  Each defendant deliberately mischaracterized the testimony of multiple witnesses, including Mary Bischoff, Gail Stanley, Bruce Robertson, Sterling Holt, Martin McCoy, Richard Rodriguez, and Ted LeBlanc.  Defendants knew or should have known that these witnesses would, and were known to, testify falsely in Plaintiff's case.  Defendants Samonsky and McCoy deliberately concealed and fabricated evidence that led to a false and wrongful conviction.  The false evidence asserted herein encompasses the conduct alleged in paragraphs 1 – 139.

145.  As noted ante and post, Defendants Samonsky, McCoy and Does 1 – 10, acting under color of state law, deprived Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States, in particular the right to have a trial free from constitutional defect, and free from the introduction of false evidence.

146.  Each act of improper influence, as well as other actions related to them, constitutes an overt act in furtherance of said conspiracy.

147.  Alternatively, as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of each other.

148.  Defendants Samonsky, McCoy and Does 1 – 10 knew or should have known that evidence set forth above, was false, and that the witnesses were providing false evidence.

149.  The constitutional source against using false evidence is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's Due Process rights were violated by the conduct alleged herein.  Plaintiff brings this claim as both a procedural and a substantive due process violation.  To the extent that any court were to conclude that the source of Plaintiff's right to right

1    to be free from concealed and fabricated evidence that led to a false and
2    wrongful conviction, is any constitutional source other than due process (such as
3    the Fourth Amendment or Sixth Amendment right to a fair trial), this claim is
4    brought on those bases as well.

5    150.    Defendants Samonsky, McCoy, and the other Doe defendants were each jointly
6    and severally responsible to not use false evidence against Mr. Hanline.

7    151.    Each engaged in, knew or should have known of the unconstitutional conduct
8    alleged herein and failed to prevent it, which each had a responsibility to do, and
9    each ratified, approved or acquiesced in it.

10    152.    As a result of the defendants' violations, and each of their violations of Mr.
11    Hanline's constitutional rights to have a fair trial free from constitutional defect
12    and free from the introduction of false evidence, Mr. Hanline was damaged as
13    alleged above.

14    ## FOURTH CLAIM FOR RELIEF
15    ## JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS
16    ## 42 U.S.C. § 1985
17    ## FALSE EVIDENCE VIOLATION
18    ### (Against Defendants Samonsky, McCoy and Does 1 – 10)

19    153.    Plaintiff realleges paragraphs 1 – 152, as well as any subsequent paragraphs
20    contained in the Complaint, as if fully set forth herein.

21    154.    Defendants Samonsky, McCoy and Does 1 – 10, were jointly and severally
22    responsible to not use false evidence in the prosecution of Plaintiff Michael
23    Hanline.

24    155.    Defendants Samonsky, McCoy and Does 1 – 10, acting under color of state law,
25    acted in concert, conspired and agreed with each other and/or Bruce Robertson
26    to deprive Plaintiff of rights, privileges, or immunities secured by the
27    Constitution and laws of the United States, in particular the right not to have false
28    evidence used in the Hanline case, as elaborated above.  The use of false

evidence, as well as other actions related to the use of such evidences, constitutes an overt act in furtherance of said conspiracy. Alternatively, as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of each other.

156. As a result of the defendants' violations, and each of their violations of Mr. Hanline's constitutional rights to have a fair trial free from constitutional defect and free from the introduction of false evidence, Mr. Hanline was damaged as alleged above.

## FIFTH CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS
## 42 U.S.C. § 1983
## SUPERVISORIAL LIABILITY

### (Against Defendants McCoy, County of Ventura, and Does 1 – 10)

157. Plaintiff realleges paragraphs 1 – 156, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

158. During the course and scope of the Hanline investigation, Defendant McCoy was the lead detective and supervisor to Ventura County Sheriff's Department Officer Richard Rodriguez, and supervised Rodriguez on the Hanline investigation.    Defendant McCoy was an experienced detective, and was obligated to ensure that Defendant Rodriguez properly performed his duties as an investigator, which would also include ensuring that Mr. Hanline's constitutional rights were protected.

159. Further, Defendant County of Ventura was responsible for the actions of its employees, including Defendant McCoy, performed within the course of the employees' terms of employment. As such, Defendant County of Ventura was obligated to ensure that Defendant Rodriguez properly performed his duties as an investigator, which would also include ensuring that Mr. Hanline's constitutional rights were protected.

160.  On the weekend of the murder, beginning on or about November 10, 1978, Defendant McCoy was training and supervising Richard Rodriguez, who was less-experienced detective on the case. During the entirety of the investigation of this case, Defendant McCoy was Richard Rodriguez's supervisor, partner, and trainer. Upon information and belief, Defendants McCoy and Doe, supervisors within the Ventura County Sheriff's Department who were responsible for monitoring Rodriguez's performance and conduct as a Detective in this investigation, were on notice of Rodriguez's lack of experience and training as a homicide Detective. Despite this responsibility, Defendants failed to take adequate steps to correct Rodriguez's failures through training or supervision.

161.  Upon information and belief, Richard Rodriguez received minimal discipline, training, and supervision, which level was grossly insufficient to address the inept, inadequate, and deceitful investigation conducted in the Hanline case.

162.  The inept, inadequate, and deceitful investigation was a highly predictable or plainly obvious consequence of the inadequate training and lack of meaningful control or supervision of Richard Rodriguez.

163.  Defendant McCoy, and Doe supervisors 1 – 10, acting within the course and scope of their employment had a duty to assure the competence of their employee/agents, including Richard Rodriguez and Does 1 – 10, but breached their duty and were negligent in the performance of their duties to select, train, review, supervise, evaluate competency, and retain Rodriguez and other employee/agents. This breach of the duty of careful selection, training, review, supervision, periodic evaluation of the competency, and retention of such law enforcement officers and/or employees and/or agents created an unreasonable risk of harm to persons such as Plaintiff.

164.  Defendant McCoy, and Doe supervisors 1 – 10 knew or should have known that Richard Rodriguez was unfit and/or incompetent to investigate the homicide due to his lack of experience unfitness and/or incompetence. This created a

1   particular risk to others.   The negligence of Defendant McCoy and Doe
2   supervisors 1 – 10 in the supervision and training of Richard Rodriguez was a
3   substantial factor in the harm caused to Plaintiff by Rodriguez.

4   165.   Defendant McCoy, and Doe supervisors 1 – 10 breached their duty of care to
5   observe, report, monitor, and control the investigation by Detective Rodriguez
6   and other employee/agents.

7   166.   As a direct and legal result of the aforesaid negligence, carelessness, and
8   unskillfulness of Defendant McCoy, and Doe supervisors 1 – 10, and each of
9   them, and as a result of their breach of duty of care to Plaintiff, Plaintiff suffered
10   the damages as alleged herein.

## SIXTH CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS
## 42 U.S.C. § 1983
## *MONELL* VIOLATIONS
### (Against Defendant County of Ventura)

16   167.   Plaintiff realleges paragraphs 1 – 166, as well as any subsequent paragraphs
17   contained in the Complaint, as if fully set forth herein.

18   168.   Municipal corporations may be named in a lawsuit for deprivation of
19   Constitutional rights, as this lawsuit claims.   *Monell v. Dept of Social Services,*
20   436 U.S. 658, 701 (1978). A municipality is liable when the constitutional injury
21   to the plaintiff resulted from the implementation or "execution of a government's
22   policy or custom, whether made by its lawmakers or by those . . . said to
23   represent official policy." *Monell, supra,* 436 U.S. at 694.  Municipalities may
24   also be liable by failing to create, promote, or promulgate policies and practices
25   which would protect the Constitutional rights of individuals.   *City of Canton v.*
26   *Harris,* 489 U.S. 378 (1989).

27   169.   Plaintiff is informed and believes, and thereon alleges that, at all times herein
28   mentioned, Defendant County of Ventura, and Does 1 – 10, with deliberate

1    indifference, and conscious and reckless disregard to the safety, security, and
2    constitutional and statutory rights of Plaintiff, engaged in the unconstitutional
3    conduct and omissions as is specifically elaborated in paragraphs 1 – 163, above,
4    which consist of the following customs and/or policies:

5    a.    The knowing presentation of false evidence by officers;

6    b.    The deliberately indifferent presentation of false evidence by officers;

7    c.    The presentation of false evidence by deputies and officers in reckless
8          disregard for the truth or the rights of the accused;

9    d.    Officers' failure to provide exculpatory evidence to the defense;

10   e.    Failing to adequately train, supervise and control its officers in the
11         investigation and questioning of witnesses and confidential informants,
12         and thereby failing to prevent the use of fabricated testimony by witnesses;

13   f.    Failing to adequately train, supervise and control its officers to disclose to
14         the defense all exculpatory and impeachment information, including
15         *Giglio v. United States*, 405 U.S. 150 (1972) and *Brady* information,
16         which would include impeachment evidence of witnesses, exculpatory
17         evidence, evidence of third-party culpability, and alternative theories
18         which would support the defense;

19   g.    Failing to adequately discipline officers involved in dishonesty or
20         otherwise abusing their authority;

21   h.    Condoning and encouraging officers in the belief that they can violate the
22         rights of person such as Mr. Hanline with impunity, and that such conduct
23         will not adversely affect their opportunities for promotion and
24         employment benefits; and

25   i.    Condoning and encouraging the fabrication of evidence, including but not
26         limited to the filing of materially false police reports, concealing material
27         evidence and improperly influencing witnesses, the use of techniques to
28         influence or shape witness testimony, and/or making false statements to

1  the prosecutor to obtain the filing of false charges and obtaining false
2  convictions.

3  170.  Plaintiff is informed and believes that the Ventura County Sheriff's Department
4  had no established or clear policy regarding the following issues pertaining to the
5  disclosure of exculpatory evidence pursuant to its obligations under *Brady v.*
6  *Maryland*:

7  a.  Maintaining files and information regarding exculpatory and third-party
8  suspect information;

9  b.  Maintaining information received from confidential informants, and
10  properly drafting reports on exculpatory information received by
11  informants;

12  c.  Ensuring that information regarding exculpatory information received by
13  informants was provided to the defense in the case, regardless of whether
14  the informant was to testify;

15  d.  Fully and completely documenting law enforcement personnel's
16  interactions with informants;

17  e.  Ensuring that the information and testimony provided by informants was
18  reliable;

19  f.  Training law enforcement personnel in handling informant information
20  and providing it to the defense in the case, and in disclosing or refraining
21  to disclose informant information to the defense in the case, regardless of
22  whether the informant was to testify; and

23  g.  Supervising law enforcement personnel in the provision of informant
24  information to the defense, regardless of whether the informant was to
25  testify.

26  171.  Plaintiff is informed and believes that to the extent the Ventura County Sheriff's
27  Department had policies regarding the issues set out in the foregoing paragraph,
28  the policies were not known to or implemented by law enforcement personnel

1  in cases in which an informant was involved in a case.

2  172.  Because the policies, practices and customs set forth in the foregoing paragraphs

3  meant that certain exculpatory, material information did not reach the defense,

4  and because the information was both exculpatory and pointed to the culpability

5  of third parties, these policies, practices and customs directly deprived Plaintiff

6  Hanline of a fair trial.

7  173.  In addition, Plaintiff is informed and believes that the Ventura County Sheriff's

8  Department had no established or clear policy regarding the following issues

9  pertaining to the disclosure of exculpatory evidence and impeachment material:

10      a.  Ensuring that all law enforcement personnel complied with the

11          requirements of due process, including those set out in *Brady v.*

12          *Maryland*, 373 U.S. 83 (1963);

13      b.  Ensuring that law enforcement personnel, whether through inadvertence

14          or design, did not fail to provide information to the defense which was

15          either exculpatory, impeaching, or pointed to the culpability of third

16          parties;

17      c.  Fully and completely documenting law enforcement personnel's

18          interactions with witnesses involved in a case;

19      d.  Training law enforcement personnel to provide to the defense

20          information that is exculpatory, impeaching, or pointed to the culpability

21          of third parties;

22      e.  Supervising law enforcement personnel in the provision of exculpatory

23          identification information to the defense.

24  174.  Plaintiff is informed and believes that to the extent the Ventura County Sheriff's

25  Department had policies regarding the issues set out in the foregoing paragraph,

26  the policies were not implemented.

27  175.  The actions and inactions of the Ventura County Sheriff's Department set forth

28  in the preceding paragraphs were known or should have been known to the

COMPLAINT 38

policy makers responsible for the Ventura County Sheriff's Department and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and or to the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise or discipline in areas where the need for such training was obvious.

176.   The actions and omissions of the Ventura County Sheriff's Department set forth in the preceding paragraphs were a driving force behind the violations of Mr. Hanline's constitutional rights as set forth in this complaint.

177.   Defendant County of Ventura had a duty to create a system in which information pertaining to witnesses and confidential informants, including Bruce Robertson and witness "A," would be disseminated to the defense, regardless of whether or in what form the witness was to testify.   Deputy District Attorney Michael Schwartz prosecuted Mr. Hanline's preliminary hearing, and Deputy District Attorney Louis Samonsky prosecuted Mr. Hanline's trial.   The County of Ventura's failure to create such a system directly resulted in the defense having no access to vital exculpatory evidence, impeachment evidence, and evidence of third-party culpability.

178.   Plaintiff is informed and believes that based on the County's failure to create a system in which information pertaining to witnesses and confidential informants would be shared among personnel, would be able to be accessed by personnel, and would be shared with the defense before and during the prosecution of the case, and the failure to train law enforcement personnel to disseminate information pertaining to such witnesses, the County of Ventura had a pattern and practice of permitting witnesses to testify falsely at trial in a way which portrayed them as disinterested witnesses with no motivation to testify, when in truth and fact, these witnesses:

a.   Had specific and total knowledge of facts of the murder, facts which could not have been known unless they were present during the murder or

1           themselves participated in the murder;

2         b.   Lied about how they knew of these facts, representing instead that other

3              witnesses (specifically, witness Mary Bischoff) had told them these facts;

4         c.   Had specific and clear motivations to point the investigation away from

5              the true perpetrators, either because (as in the case of Bruce Robertson)

6              they were associated with or represented the true perpetrators, or because

7              (as in the case of Joe Teresi, witness "A," Larry New, Chris Kuen, and Jim

8              Stymus) they were named as being involved in the murder; and

9         d.   Had specific and clear motivations to commit the crime, as the victim, J.T.

10             McGarry, had been embezzling from and/or owed money to witnesses Joe

11             Teresi, witness "A," Larry New, Chris Kuen, and Jim Stymus.

12 179. Plaintiff is informed and believes that, based on the County's failure to create a

13      system in which information pertaining to witnesses would be provided to the

14      defense, and because of the County's failure to train and supervise law

15      enforcement personnel to disseminate information pertaining to the defense, the

16      County of Ventura had a pattern and practice of using unreliable testimony of

17      witnesses to secure criminal convictions, knowing that such testimony was false,

18      or made in reckless disregard to the falsity of the testimony.

19 180. The actions and inactions of the Ventura County Sheriff's Department set forth

20      in the preceding paragraphs were known or should have been known to the

21      policy makers responsible for the Ventura County Sheriff's Department and

22      occurred with deliberate indifference to either the recurring constitutional

23      violations elaborated above, and/or the strong likelihood that constitutional rights

24      would be violated as a result of failing to train, supervise, or discipline in areas

25      where the need for such training and supervision was obvious.

26 181. The actions of the Ventura County Sheriff's Department set forth herein were

27      a motivating force behind the violations of Mr. Hanline's constitutional rights as

28      set forth in the Complaint.

182. As a direct and proximate result of Defendant County of Ventura's acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of Defendants Samonsky, McCoy and Does 1 – 10, Plaintiff sustained injury and damage.

183. As a result of defendants', and each of their violations of Mr. Hanline's constitutional rights as set forth herein, Mr. Hanline was damaged as alleged above.

WHEREFORE, Plaintiff, Michael Ray Hanline, requests relief on his own behalf as follows, and according to proof, against each Defendant:

1.  General and compensatory damages in any amount according to proof;

2.  Special damages in any amount according to proof;

3.  Exemplary and punitive damages against each Defendant, except the County of Ventura, in an amount according to proof;

4.  Cost of suit, including attorneys' fees, under 42 U.S.C. § 1988; and,

5.  Such other relief as may be warranted or as it just and proper.

## JURY DEMAND

Trial by jury of all issues is demanded.

Respectfully submitted,

Dated: 11/11/15

JAN STIGLITZ
Attorney for Plaintiff
**MICHAEL RAY HANLINE**